Filed 12/4/14  P. v. Ha CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>CHRIS CHI HA,<br><br>      Defendant and Appellant. | B248517<br><br>(Los Angeles County<br>Super. Ct. No. GA085549) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell S. Mavis, Judge.  Affirmed.

Gregory Demirchyan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

_____

Chris Chi Ha appeals his conviction by a jury of second degree robbery and possession of a firearm by a felon. Finding no error, we affirm.

An amended information filed March 18, 2013 charged Ha with one count of second degree robbery in violation of Penal Code section 211[1] and one count of possession of a firearm by a felon pursuant to section 29800, subdivision (a)(1). The information also alleged that during the robbery, Ha personally used a firearm (§ 12022.53, subd. (b)), that Ha had one prior "strike" conviction and one prior serious felony conviction, and that Ha had served two prior prison terms. Ha pleaded not guilty and denied the allegations.

At trial, David Decker testified that in February 2012, he had worked 40 hours a week for a year and a half as a loss prevention officer at a Walmart in Rosemead. His job was to stop shoplifters, and he had made around 300 apprehensions from August 2010 to February 2012. To make the apprehensions, Decker walked the floor to look for shoplifters and also used stationery cameras, but mostly he and the other loss prevention officers used pan, tilt, and zoon (PTZ) cameras, which could be controlled from the office and could pan, tilt, and zoom to get perfect clarity regarding what someone was doing with their hands. In watching for shoplifters, Decker looked for suspicious behavior such as someone grabbing a lot of the same items, grabbing high-priced items, grabbing something and walking away, or wandering and looking out for people in the aisles.

On February 10, 2012, Decker saw Ha in the Walmart, identifying Ha in court and in two photographs taken as stills from the video on the PTZ camera, which accurately represented what Decker had seen that day on the videocamera. Decker was in the office on the PTZ cameras when he first saw Ha in the cologne aisle grabbing two high-priced colognes, but Decker stopped observing Ha when he did nothing with the colognes. When Decker went to use the bathroom he saw Ha there with a big red backpack which Ha had not carried when Decker had watched Ha earlier in the cologne aisle. Decker

_____

[1] All further subsequent statutory references are to the Penal Code unless otherwise indicated.

2

called his coworker and asked him to put the PTZ camera on Ha until Decker could get to the office and take over.

Decker reviewed earlier video footage and saw Ha enter the store without a backpack. He also saw Ha (without a backpack) walk down an aisle where the backpacks were displayed, and then walk to another aisle carrying the backpack Ha selected. Also in the earlier footage, Ha began stuffing items into the backpack (Decker could not see what the items were).

Decker then turned to the PTZ camera and began to track and observe Ha, who went to the liquor department and selected two packages of four to five plastic lighters. He then saw Ha go to the detergent aisle, place the packages of lighters on a shelf and start looking around and "messing" with the packages, stopping every time another customer went by. Although the footage did not show Ha unwrapping the lighters, based on Decker's background, training, and experience, Decker believed that was what he was doing. The video and one of the still photos, People's exhibit 11, showed Ha from the waist up with what Decker believed was the top part of a lighter in his hand, and Decker also believed based on his experience that the video showed Ha placing the lighter in his right pants pocket. As soon as Ha left the detergent aisle, Decker sent Francesco Perez to the aisle to look for the lighter packages, and Perez brought back the empty packages.

Decker continued to observe Ha on the PTZ cameras, looking for the four elements required before he could stop a shoplifter (selection of the item, concealment, continued observation, and passing the last point of sale). Ha selected some sunglasses in the jewelry department, and then went to a register and paid for a bottle of lotion and two drinks, still carrying the backpack, and started to leave the store. Decker and Perez left the office and exited the Walmart by the nearby south exit, heading for the north exit, where they approached Ha.

Perez began to identify himself as Walmart security, showing his badge, and Ha dropped the backpack (which contained a drill charger that was Walmart merchandise and several other items) and began to flee in Decker's direction. The confrontation was shown in still photos taken from footage from an outside stationary camera. Decker

3

grabbed Ha's arm and wrestled him to the floor, with Decker's chest on Ha's back and his arms around Ha's chest. Decker patted Ha's chest, saying "relax, I don't want to call the cops, and I am Walmart security." Perez was also telling Ha to calm down and relax, and Ha kept struggling and repeating, "'What did I do?'" "'Let me go. What did I do?'" Decker told him, "'You stole. Come with me.'"

Still holding Ha's midsection, with Perez holding Ha's left arm and a manager, Richard Tabares, holding Ha's right arm, Decker began to drag Ha back to the south entrance where the office was located. Tabares was on the phone with the sheriff's department. Ha continued to struggle and repeated, "'Let me go, please, what did I do.'" As they reached the corner to turn to the office, Decker felt Ha move and heard Tabares yell, "'He has a gun.'" Decker let go of Ha and pushed him away, and Decker, Perez, and Tabares ran. Exhibit 22 showed Ha pointing a black gun at them.

Decker dove down onto the floor expecting to hear shots, rolled over, and saw Ha looking down at him and pointing the gun at him while Ha ran away toward the north end of the parking lot. Decker lost sight of Ha when he went between the cars. Decker reviewed the outdoor video camera footage, which showed Ha drop something and pick it up.

The backpack Ha dropped contained a drill charger and some other items. Decker recognized the charger as Walmart merchandise, and also identified the sunglasses that Ha had selected inside the store. Later, the sheriffs returned to Decker the lighters Ha took and some knives which were a brand Walmart sold, although Decker had not seen Ha take them.

Decker had been fired by Walmart in April 2012 for making a "bad stop," stopping customers for shoplifting when they had not shoplifted, while he was on probation for pursuing a shoplifter for more than 10 feet.

Perez testified that on February 10, 2012, he and Decker watched Ha on the video in the detergent aisle struggling with something he was concealing in his hands and looking around, stopping if anyone walked into the detergent aisle. Perez went to the aisle after Ha left it, where he found a ripped-into, empty four-pack of lighters (a brand

4

carried by Walmart) hidden behind Clorox bottles, and carried it back to the office to show Decker. Perez and Decker then watched Ha on the video until he left the Walmart. Perez described Ha's apprehension, and when Perez heard Tabares yell, "'Gun, gun,'" he saw Ha pull the gun toward his waist, transfer it to his left hand, and cock it. Perez and Decker ran for cover.

Tabares testified that he saw on the video camera that Ha was leaving the store, and he ran outside to join Perez and Decker. He grabbed Ha's right hand and called the sheriff. The jury was given a transcript of the 911 call and listened to a recording. As they were about to round the curb to the south entrance, Tabares saw Ha reach to his waistband and pull out a gun; Tabares screamed, "'He has a gun,'" and he, Decker, and Perez disengaged and ran away. The gun looked real to Tabares, and it looked and sounded as if Ha cocked it to be ready to fire. Tabares turned around and saw Ha point the gun at Decker, who was on the ground.

Deputy Daniel Esqueda testified that he responded to the Walmart call, saw Ha travelling west, pulled his gun, and ordered Ha to stop. Ha continued to walk and then began to run, stopped at a corner, and was detained by another unit. Deputy Esqueda found six loose cigarette lighters in Ha's right front pants pocket, and four folding knives in different pants pockets. The deputies retraced Ha's path back to the Walmart and searched for a gun, but did not find one.

In closing, Ha's counsel admitted that Ha committed theft and that the prosecution had proven shoplifting. Counsel argued that Ha dropped the backpack before trying to get away with Walmart property and had therefore not committed robbery. There was no photograph or video showing Ha putting the lighters in his pocket, or of the lighters that Deputy Esqueda testified were in Ha's pocket when he was arrested. The only evidence was a photograph of an empty lighter package, and that was not enough to prove that Ha removed Walmart property.

The jury convicted Ha of second degree robbery and possession of a firearm by a felon, and found true that Ha personally used a firearm. In a bifurcated trial, the court found true the prior conviction and prior prison term allegations. Ha was sentenced to an

5

aggregated term of 21 years in state prison, ordered to pay fines and fees, and received presentence custody credits.

## DISCUSSION

**I.      Ha forfeited his claim that the video footage and snapshots were improperly admitted into evidence.**

At trial and throughout Decker's testimony, exhibits 1 to 25, time-stamped photographic still "snapshots" taken from video footage from stationary surveillance cameras and PTZ cameras were shown to the jury, and the prosecution played for the jury clips from exhibit 26, a CD of the video footage bearing the name of the case. Decker testified that on the morning of his testimony, he reviewed all the video footage contained on exhibit 26 and had signed and dated the disk. The footage accurately represented the video that he reviewed or took on February 10, 2012. Decker had pulled the clips from Walmart's system using a DVR player and CC-TV program in the office and saved them as a file. The video footage accurately depicted what he either saw, or viewed on video, on the day of the robbery.

When the prosecutor asked Decker whether he recognized Ha in exhibits 1 and 2, both snapshots, Decker answered yes, and explained that the photographs were taken from the video footage. When the prosecutor asked whether the stills accurately represented what Decker saw on the video on February 10, 2012, Ha's attorney objected that the question was vague as to which stills were being discussed. The court sustained the objection, and the prosecutor clarified that the question was whether exhibits 1 and 2 accurately represented what Decker saw on the video of the liquor aisle, and whether they accurately represented what Ha looked like on that day; Decker answered yes. This was the only objection to the exhibits. The remaining snapshots and the video footage were shown to the jury during Decker's testimony, and Decker stated that each accurately represented what he saw on the video cameras that day. The exhibits were admitted into evidence with no objection from the defense.

Ha now argues that the snapshot exhibits lacked foundation and were not properly authenticated, because Decker did not personally observe Ha take items and place them

6

in the backpack, but saw Ha do so only with the aid of the video cameras, whose accuracy was not established. Ha further argues that the video was a composite shown to the jury without testimony about the technical functioning of the surveillance system or adequate explanation regarding how the recordings were compiled, making the composite "vulnerable to all manner of distortion and manipulation."

Ha failed to object to the still photos or to the video footage at trial on the basis that they were without foundation or not properly authenticated, and so those "are issues not properly before us because defendant did not object to the admission . . . on either ground." (*People v. Williams* (1997) 16 Cal.4th 635, 661 [failure to object to tape-recording of defendant's interview].) The prosecution laid the foundation for the still photographs and the videotape through Decker's description of the system and his testimony that the exhibits accurately depicted what he observed on the video on February 10, 2012. "Had defendant believed this foundation was inadequate, it was incumbent upon him to bring the matter to the attention to the trial court, and he may not raise the issue for the first time on appeal." (*People v. Hines* (1997) 15 Cal.4th 997, 1045, fn. 7 [tape-recording of conversation].)

In any event, authentication of a photograph is required before admission into evidence and is to be determined by the trial court. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) After a preliminary showing of relevancy, "[t]he proof that is necessary to authenticate a photograph or video recording varies with the nature of the evidence that the photograph or video recording is being offered to prove and with the degree of possibility of error. [Citation.] . . . The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case. [Citation.] The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. [Citation.] Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.'" (*Id.* at p. 267.) To show that a photograph or video

recording is a fair and accurate representation of what it shows, the "foundation may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded. [Citations.] It may be supplied by other witness testimony, circumstantial evidence, content and location. [Citations.]" (*Id.* at p. 268.)

The video recording and photographs were relevant to show that Ha took items from Walmart without paying, and used force and fear against the Walmart employees to retain the stolen property as required for a conviction under section 211, which penalizes taking personal property from the person and immediate presence of another "by means of force or fear." Decker testified that he had compiled the video clips from the security camera footage on the day of the robbery, that he watched all the video on the morning of his testimony, and that the footage and each of the snapshot exhibits accurately represented what he saw either in person or on the video the day of the robbery.

Ha argues that Decker could not adequately authenticate the exhibits because he did not personally observe all the events at the Walmart shown in the photographs, especially Ha's opening of the lighter packages in the detergent aisle and placing lighters in his pants pocket. For the prima facie case required to support admissibility, however, the foundation need not be supplied by the person taking the photograph or by a person who witnessed the event. (*People v. Goldsmith*, *supra*, 59 Cal.4th at pp. 267–268.) It is enough that there is "'testimony of anyone who knows that the picture correctly depicts what it purports to represent.'" (*People v. Chism* (2014) 58 Cal.4th 1266, 1303.) To require for admissibility that a witness testify to personal observation of every event shown on a surveillance video would defeat the purpose of such surveillance cameras, which often record what no witness observes. The trial court did not abuse its discretion in admitting the video footage and still photographs.

Ha argues that his counsel rendered ineffective assistance by failing to challenge the admission of the video footage. To succeed on such a claim, Ha has the burden to show that counsel's conduct was not objectively reasonable, and that Ha was prejudiced as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674].) We disagree because the footage was admissible, so it was not

8

objectively unreasonable to fail to challenge it. In cross-examining Decker, Ha's counsel challenged the quality and the limitations of the video footage and pointed out that Decker did not observe Ha with the cameras the entire time Ha was in the Walmart. Ha's counsel also used the footage to argue that Decker and Perez engaged in an inappropriate physical altercation in violation of Walmart policy when they apprehended Ha outside the Walmart. Further, Ha's counsel used the video footage to challenge the robbery charge. On cross-examination, confronted again with the video footage, Decker admitted the video did not show Ha place the lighters in his pocket, and he assumed rather than saw that Ha pocketed the lighters. In closing, counsel argued that Decker was merely speculating, and that given Decker's employment history at Walmart he was an unreliable witness attempting to avoid blame for mishandling Ha's apprehension. Ha's counsel also argued that because the video footage showed that Ha relinquished the backpack before resisting or fleeing, the elements of robbery were not proven, as property was not taken by force or fear. Counsel could have made a tactical decision to use the footage to counter the testimony and other evidence that Ha left the Walmart with the backpack containing shoplifted merchandise and that upon his arrest he still had shoplifted lighters (whose empty packaging was found by Perez) in his pants pocket.

## II. The trial court did not abuse its discretion when it denied a continuance for Ha to retain private counsel.

Ha argues that he was denied his Sixth Amendment right to counsel when the trial court denied his request made on the first day of trial, for a continuance to hire private counsel. We see no abuse of discretion.

Ha's appointed counsel, Lydia Marquez, told the judge on the first day of trial, November 7, 2012, that Ha had just informed her for the first time since his arraignment nearly nine months earlier "that he would like time from this court to explore the possibility of hiring a private attorney in this case to handle this trial, and so we are making that request." Counsel explained that it was not clear whether Ha's family could come up with the money. The prosecutor objected, as he was ready to go to trial with witnesses lined up and "this has been put over multiple times, and we are ready, and this

9

is the first we have heard of an interest in hiring a private attorney." Ha stated, "I just feel like, you know, that maybe before we could have worked out something prior to my preliminary deal sort of, but we couldn't come to that agreement. So that's why I feel like my best chance I have is with a private attorney. [¶] And we just been trying to come up with the money. That's it. And he had represented me before, so, you know, and I—I just feel like my—my life and my freedom are at hand, and, you know, I am putting everything I have out there to get this—this lawyer, and that's all. I am just trying to get the—fight for my freedom. That's all. [¶] Nothing against Ms. Marquez, you know. She's doing an excellent job, because I know she's overworked and stuff like that. So I don't know. It's just—that's all, your honor." The court asked Marquez if she was ready for trial, and she said yes. The court then stated that it would deny "[Ha's] motion for, essentially, a continuance to hire private counsel . . . . It should have been made a long time ago. Certainly you could have put the court on notice even yesterday when we announced whether or not the parties were ready for trial. There was no mention of this." The jury was in the hallway, and because of the stage of trial, "the right of the People to have this trial heard in a timely fashion and . . . your counsel is ready to proceed [i]n this case, for all of these reasons, the court is not going to delay this trial at this point, and we're going to go forward. [¶] Okay. So the motion for a continuance to hire private counsel is respectfully denied at this point."

We review for abuse of discretion the court's denial of a continuance to substitute retained counsel for appointed counsel. (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1367.) A defendant's right to counsel includes the right to retain counsel of choice, which must be balanced "'against other values of substantial importance, such as that seeking to insure orderly and expeditious judicial administration, with a view toward accommodation reasonable under the facts of the particular case.'" (*People v. Courts* (1985) 37 Cal.3d 784, 790 (*Courts*).) We look to the circumstances of the case, particularly the reasons the defendant presented to the trial judge when the request for continuance was denied. (*Id.* at p. 791.) If the defendant is "'unjustifiably dilatory' in retaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial,'"

10

the court acts within its discretion in denying a continuance. (*Id.* at pp. 790–791.) Circumstances where the continuance request is "premised on the accused's representation that he would *eventually* be able to hire counsel of his own choosing," or where "participation by a particular private attorney was still quite speculative at the time the motion for continuance was made" are "to be sharply contrasted" with circumstances where private counsel has been found and retained, or at least good faith, diligent efforts to do so can be shown. (*Id.* at pp. 791–792 & fn. 3.) "[A] defendant who desires to retain his own counsel is required to act with diligence and may not demand a continuance if he is unjustifiably dilatory or if he arbitrarily desires to substitute counsel at the time of trial." (*People v. Blake* (1980) 105 Cal.App.3d 619, 623–624.)

Ha moved for a continuance on the first day of trial. Marquez stated that this was the first time she had heard that he wanted to explore retaining private counsel. Further, participation of the private attorney was speculative, as Ha's family was still trying to come up with the money, and there was no indication that Ha or his family had spoken to the private counsel, that private counsel would agree to represent Ha, or that private counsel would be ready to go to trial in a reasonable length of time. The length of the requested continuance was thus indeterminate. Ha's reasons for wishing to retain private counsel included that counsel had represented him before. Ha also referred to a failure to "work[] out something prior to [his] preliminary deal sort of," but even construing that as a reason for desiring to retain private counsel based on something that occurred in an earlier stage, Ha did not act on that reason until the jury was waiting outside the courtroom. And if Ha's statement is a criticism of appointed counsel Marquez, Ha also stated that she was doing an excellent job although she was overworked.

Ha argues that the trial court did not conduct an adequate inquiry into his reasons for requesting a continuance. He cites federal and California cases involving actual conflict of interest; irreconcilable conflict between the defendant and his client; requests for substitution of appointed counsel with another appointed counsel under *People v. Marsden* (1970) 2 Cal.3d 118; and a claim that the defendant did not have a meaningful attorney-client relationship with a substituted public defender. None of those cases

11

governs this factual situation, where Ha sought a continuance to substitute not-yet-retained private counsel for appointed counsel who he acknowledged was doing an excellent job.

In the absence of "compelling circumstances" (*Courts*, *supra*, 37 Cal.3d at p. 792, fn. 4), the court acted within its discretion in denying the day-of-trial request for a continuance to hire private counsel, especially in the light of Ha's failure to raise the issue just the day before when the court asked the parties if they were ready for trial.

## III. Ha forfeited his claim that the trial court's questioning during voir dire was inadequate.

Ha argues that his Sixth Amendment right to a fair and impartial jury was violated when the trial court did not adequately examine prospective jurors, and therefore failed to discover implied biases in several jurors who stated they had been victims of "purse-snatching" and other crimes. Ha points to Prospective Juror No. 1, who in response to a question whether any juror had been a victim of a crime, stated, "I was a victim of a purse-snatching some years ago," and Prospective Juror No. 16, who stated, "I have had a purse snatched." The trial court asked each of the prospective jurors whether that experience would affect her ability to be fair in this case, and each answered no. In supplemental briefing, Ha also identified Prospective Juror No. 31, who answered that a group came into the store where she was working, and while two people distracted her, the others took something, but that would not affect her ability to be fair. Finally, Prospective Juror No. 40 stated he had been "robbed at gunpoint" 22 years ago, and in response to further questioning by the judge, stated that he could "[p]robably" base his decision on what happened in the courtroom, not on his prior experience. As Ha concedes, however, Prospective Juror No. 40 did not serve on the jury and therefore there was no possible prejudice to Ha. We therefore focus on Prospective Juror Nos. 1, 16, and 31, who did serve on the jury. Ha argues that the trial court's questioning of these jurors during voir dire did not go far enough to allow a defense challenge for cause for implied bias.

12

Ha's counsel did not object to the court's questioning of the prospective jurors or seek any more detailed inquiry, and he has therefore forfeited the claim that the court's questioning was insufficient. A defendant who does not raise the issue at voir dire "has waived this claim by his failure to seek a more extensive or broader inquiry of the juror[s] at the time, or in any other way to object to the trial court's course of action. . . . Having failed to suggest any additional examination was required, thereby preventing the trial court from considering any arguments for conducting further examination, [Ha] 'is not privileged to make the argument now for the first time on appeal.'" (*People v. Holloway* (2004) 33 Cal.4th 96, 126–127.) "'[O]bjections to the jury selection process must be made when the selection occurs,'" and if defense counsel has the opportunity but fails to raise an objection to the court's questioning of jurors, the defendant has forfeited his right to have the prospective jurors questioned on the subject. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 313 [failure to raise issue of questioning about racial bias].)

On the merits, we find no abuse of discretion by the trial court in failing to inquire further regarding possible bias. (*People v. Holloway*, *supra*, 33 Cal.4th at p. 127; *People v. Ray* (1996) 13 Cal.4th 313, 343.) A criminal defendant has a constitutional right to trial by an impartial jury. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) An impartial juror is capable to decide the case solely on the evidence before the juror. (*In re Hamilton* (1999) 20 Cal.4th 273, 294.) Juror bias may be implied "when the existence of the facts as ascertained, in judgment of law disqualifies the juror" (Code Civ. Proc., § 225, subd. (b)(1)(B)), and a party may challenge a juror for implied bias, including "[t]he existence of a state of mind in the juror evincing enmity against, or bias towards, either party." (Code Civ. Proc., § 229, subd. (f).) "A prospective juror's ability to be fair and impartial is explored during the process of voir dire," which can result in challenges for cause or peremptory challenges based on responses by the prospective juror. (*People v. Duran* (1996) 50 Cal.App.4th 103, 111.) A purse snatching can qualify as robbery, if more force is used that is necessary to take the purse from the victim's person: "[W]here a person wrests away personal property from another, who resists the effort to do so, the

13

crime is robbery not merely theft." (*People v. Burns* (2009) 172 Cal.App.4th 1251, 1257–1259.)

On the first day of voir dire, Prospective Juror No. 1 raised her hand when asked if she was a crime victim, told the court she was "a victim of a purse-snatching some years ago," and stated that would not affect her ability to be fair. Prospective Juror No. 16 responded, "I have had my house entered in the middle of the night, and I have had a purse snatched." Asked, "Did you ever confront the person?," she answered, "My husband did. I didn't." Her experience would not affect her ability to be fair. When the court invited Ha's counsel to talk to the jurors, counsel asked "Anybody here been a victim of a robbery with force? Mugged? Mugging?" Prospective Juror No. 1 did not respond and Prospective Juror No. 16 immediately responded, "No, no." Ha's counsel explained that a juror who was a crime victim might become upset and emotional if the fact patterns led to reliving trauma, and "would not be a good juror for this type of case." She then asked if anyone was in that situation, and no prospective juror responded yes. The court then invited the prosecutor to address and question the prospective jurors. Afterward, the prosecution and defense exercised peremptory challenges, and the court adjourned for the day.

On the second day of voir dire, the court again asked if any prospective juror had been the victim of a crime, and Prospective Juror No. 31 answered that she was a "designer at a furniture shop, and two people came in and took me off to the side to talk about something, but somebody else was stealing at that time. So they came in, like a bunch of them. So they distracted me to take something, and I didn't realize till after they left that something was gone. So then the police came in, and we had—but nothing ever happened because we didn't have any video or anything." She told the court that her experience would not affect her ability to be fair. The court then asked if any prospective jurors felt that because of the nature of the charges against Ha they could not be fair. Prospective Juror No. 31 raised her hand and explained: "I would be a little afraid because I was in that scenario. If the person actually had a gun where we were at, it would have been totally different—I would rather just give them the piece that they

14

wanted. So it kind of scares me a little since I was in that—luckily, like I said, there wasn't a gun." Questioned further by the court, she said the incident was 10 years ago and did not involve a gun. The court explained that Ha's case involved "a Walmart and some employees," and "we want to make sure . . . you'll be able to, you know, say that happened to me, but I am only going to base my decision on what happens in this courtroom with the evidence that I hear and the law that the court gives you." Prospective Juror No. 31 stated, "I can do that." Ha's counsel again addressed the prospective jurors, asking Prospective Juror No. 31, "do you think you can be fair, though, because you will take an oath to be fair? So kind of being fair, you're taking an oath, an affirmative oath to be fair and impartial. Do you think you can do that?" and Prospective Juror No. 31 answered, "I can do that." The defense and the prosecution exercised peremptory challenges, and both sides accepted the panel, which included Prospective Jurors Nos. 1, 16, and 31.

Ha argues that the questioning of the three prospective jurors was inadequate because it did not uncover whether force was used against the jurors when they were crime victims, so as to make the crimes robberies. This is not supported by the record. When the court asked on the first day of voir dire whether any of the prospective jurors had been the victims of robbery by force, Prospective Juror No. 1 did not indicate that she had, and Prospective Juror No. 16 immediately replied, "No, no." On the second day of voir dire, Prospective Juror No. 31 described an incident in which two people distracted her inside a furniture store where she was working while others took something, which no one discovered until after they left. She described no force, and in response to questioning by the court she clarified that there was no gun involved, and if there had been it would have been "totally different." The court was careful to address whether her experience would affect her judgment of the evidence, and she stated it would not. There was no indication that the court needed to question the prospective jurors more thoroughly. Further, Ha's attorney had ample opportunity to question the jurors more thoroughly on the question of whether any prospective juror had been the victim of a

15

robbery by force. The questioning during voir dire did not make Ha's trial fundamentally unfair.

## IV. Substantial evidence supported Ha's robbery conviction.

Ha argues there was insufficient evidence that he had the specific intent to permanently deprive Walmart of its property, as required for a robbery conviction. We review the record in the light most favorable to the judgment to determine whether substantial evidence supports the verdict, accepting inferences that the jury might have drawn from circumstantial evidence, and "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 396, 403.)

Robbery is the "taking of property in the possession of another, from his person or immediate presence, . . . by means of force or fear," with the intent to permanently deprive the person of the property. (§ 211.) Theft becomes robbery "'[i]f the perpetrator, having gained possession of the property without use of force or fear, resorts to force or fear while carrying away the loot. [Citations.] *In order to support a robbery conviction, the taking, either the gaining possession or the carrying away, must be accomplished by force or fear.*" (*People v. Gomez* (2008) 43 Cal.4th 249, 257.) To support a robbery conviction, the evidence must show that the intent to permanently deprive "arose before or during the commission of the act of force." (*People v. Marshall* (1997) 15 Cal.4th 1, 34.)

Ha argues that the evidence showed that he dropped the backpack when confronted by Decker and Perez, thus abandoning the backpack and its contents, and he resisted only to get away from the Walmart employees rather than to maintain possession of Walmart's property. He points out that he "got rid of the items that had the most value" and asked the officers to let him go. Ha argues that this shows he wanted to return the items he took, so that he lacked the intent to permanently deprive, and when he used force it was in response to the force used by the Walmart employees.

16

Ha's counsel made this argument in closing, and also attacked the weight of the evidence that Ha had the lighters in his possession when he was arrested. Unfortunately for Ha, the jury rejected his argument when it found him guilty on the robbery charge. We must construe the evidence in the light most favorable to the jury's guilty verdict. The deputy who arrested Ha testified that he found six loose cigarette lighters in Ha's right front pants pocket. Decker testified that based on his experience, he believed that the video showed Ha inside the Walmart unwrapping the lighter packages and placing lighters in his right pants pocket; he also testified that loose lighters were returned to him after Ha's arrest. This was substantial evidence that Ha unwrapped the lighters, which were Walmart property, inside the store and put them in his pants pocket, retained possession of them while he left the store, got into a confrontation with the Walmart employees, brandished a gun at them, and ran away with the lighters in his pants pocket. It is of no moment that the other property in the dropped backpack may have been more valuable than the lighters, as the "value of the taken property is irrelevant." (*People v. Clark* (2011) 52 Cal.4th 856, 946.) The jury could reasonably conclude that Ha intended to permanently deprive Walmart of the lighters throughout his use of force and his subsequent flight.

**V.     The trial court did not have a sua sponte duty to instruct the jury on excessive force.**

Ha argues that substantial evidence suggested that his use of force was not used to deprive Walmart of its property, but was in response to the Walmart employees' use of excessive force, and Ha therefore had a right to resist. Therefore, the trial court was required to instruct the jury on excessive force. Ha did not request such an instruction. Nevertheless, even in the absence of a request, the court must "instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) The trial court's duty to instruct sua sponte on a particular defense arises "'only if it appears that the defendant is relying on such a defense, or if there is substantial

17

evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'" (*People v. Barton* (1995) 12 Cal.4th 186, 195.)

Ha did not make any argument regarding excessive force or raise a defense that he was entitled to use force against the force employed by the Walmart employees. Further, a merchant with probable cause to believe a person is attempting to shoplift may detain the suspected shoplifter and "may use a reasonable amount of nondeadly force necessary to protect himself or herself and to prevent escape of the person detained or the loss of tangible or intangible property." (§ 490.5, subd. (f)(1), (f)(2).) Decker testified that after Perez identified himself as Walmart security outside the store, Ha dropped the backpack and began to flee in Decker's direction. Decker grabbed him by the arm and wrestled him to the floor, and both he and Perez told Ha to relax, although Ha continued to struggle as they dragged him back toward the store entrance. We have viewed the exhibits and see no substantial evidence of excessive force. Finally, the jury found that Ha personally used a gun, and "[t]he right of self-defense did not provide defendant with any justification or excuse for using deadly force to repel a nonlethal attack." (*People v. Pinholster* (1992) 1 Cal.4th 865, 966, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 458–459.) There was no duty to give a sua sponte instruction on excessive force.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.